UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

ESTRELLA ADELA JAVIER
and DANIELA JAVIER,
minor children of Wilbert Javier Prado,
appearing by their Guardian ad Litem,
Ernesto Romero,
ESTATE OF WILBERT JAVIER PRADO,
by PATRICIA D. JURSIK, Special Administrator,

        Plaintiffs,

        v.                                                      Case No. 07-C-0204

CITY OF MILWAUKEE,
ESTATE OF ALFONZO C. GLOVER,

        Defendants.

**DECISION AND ORDER ON DEFENDANTS' MOTION FOR
PARTIAL SUMMARY JUDGMENT**

## I. PROCEDURAL BACKGROUND

This action was commenced on March 2, 2007, when the plaintiffs (hereinafter collectively referred to as "Prado") filed a complaint naming the City of Milwaukee ("the City") and the Estate of Alfonzo Glover ("Glover") as defendants. The allegations in the complaint find their genesis in the shooting of Wilbert Javier Pardo by Glover on March 5, 2005. At that time, Glover was employed as a City of Milwaukee Police Officer. Since the filing of the complaint, the parties have engaged in discovery and have also litigated a number of issues in the case, including the admissibility of certain statements made by Glover prior to his death. Rendering a ruling on that particular issue became important because Glover took his own life after he was charged criminally for shooting Prado. In a June 12, 2008 decision and order, this court ruled Glover's statements to be admissible against the defendants.

On June 1, 2009, the City filed a motion for partial summary judgment seeking the dismissal of Prado's § 1983 claim against Glover, Prado's *Monell* claim against the City, and Prado's claim for punitive damages. The City's motion is now fully briefed and is ready for resolution. For the reasons that follow, the City's motion will be denied.

## II. FACTUAL BACKGROUND

In accordance with the provisions of Civil Local Rule 56.2(a) (E.D. Wis.), the City's motion for partial summary judgment was accompanied by a set of proposed findings of fact. The plaintiffs filed responses to the proposed findings of fact set forth by the City. The plaintiffs filed their own additional proposed findings of fact, and the City filed its responses thereto. A review of the parties' respective proposed findings and the responses thereto reveal that, for purposes of the court's treatment of the City's motion, the following are the facts that are relevant to the disposition of the motion for partial summary judgment.[1]

The City of Milwaukee hired Alfonzo Glover as a police officer on February 19, 2001 (Defendant's Proposed Findings of Fact ("DPFOF") ¶ 1), and he was employed as a police officer with the Milwaukee Police Department on March 6, 2005 (DPFOF ¶ 2).

On March 5, 2005, Glover worked the early shift from 4:00 p.m. until 12:00 a.m. (Plaintiffs' Proposed Findings of Fact ("PPFOF") ¶ 2.) During the early morning hours of March 6, 2005, Alfonzo Glover departed from the Third District Police Station following the completion of his shift. (DPFOF ¶ 2.) Before leaving the District at approximately 12:05 a.m., Officer Glover changed out of his uniform and into civilian clothes. He removed his duty belt, uniform shirt, badge, and name tag.

---

[1] The City claims that some of the plaintiffs' proposed findings of fact are redundant and/or irrelevant. The City also objects to some of the proposed findings on grounds of hearsay. The City does so in order to not waive any objections, while at the same time recognizing that this court previously ruled that the statements supporting such proposed findings were admissible. Such facts will be included in the court's factual summary in the interest of completeness.

(PPFOF ¶ 3.) When he left Glover was wearing his uniform pants, along with a white t-shirt and a blue jacket. (PPFOF ¶ 4.)

In leaving, Glover had with him a fully loaded (10 rounds), .45 caliber, semi-automatic Glock ("Glock"), pistol which he owned. (PPFOF ¶ 6.) The Glock was approved by the Milwaukee Police Department for off-duty use by Officer Glover. (PPFOF ¶ 7.)

Milwaukee Police Department Policy 2/900.95, which was in effect on March 6, 2005, permitted off-duty officers to carry handguns:

> **2/900.95 Off Duty Weapons**
>
> When off duty, officers may carry their Department issued handgun, or a handgun of the same design and functional characteristics as their issued handgun. Ammunition must be Department approved.
>
> Off duty weapons must first be inspected and approved by the Department Range Master, who shall record the make, model, and serial number of the weapon. This information shall be kept on file by the Range Master.
>
> Members must demonstrate proficiency with the off duty handgun prior to carrying it.

(PPFOF ¶ 8.)

On his way home, Glover noticed a vehicle behind him, flashing its high beams and following him closely. (PPFOF ¶ 10.) The van was driven by Wilbert Javier Prado. (PPFOF ¶ 11.) Glover pulled to the side of the road so Prado could pass, but Prado did not pass. (PPFOF ¶ 12.) The van continued to follow Glover with the lights flashing. (PPFOF ¶ 13.) Glover grew concerned that the driver of the van intended to rob him or carjack him or that the driver had perhaps followed him from work. (PPFOF ¶ 14.)

Glover parked his car at the northeast corner of the intersection of West Ohio Avenue and South 9th Street. (PPFOF ¶ 15.) Prado stopped behind Glover. (PPFOF ¶ 17.) There is evidence that Glover chose to stop at the intersection because it was well-lit and there are typically people in

that area at this time of the early morning due to the presence of two taverns on 9th Street and Ohio Avenue. (PPFOF ¶ 16.)

Glover exited his vehicle at or near the intersection of South 9th Street and West Ohio Avenue. (PPFOF ¶ 18.) There is evidence that Glover heard the van accelerate and believed that the van's operator was attempting to strike him with the van. (PPFOF ¶ 19.)

Glover stated, "I'm a cop" as he leaped out of the way and fell to the ground. (PPFOF ¶ 20.) At that point, Glover considered himself to be acting as a police officer. (PPFOF ¶ 21.) The Milwaukee Police Department rules and regulations in effect on March 6, 2005 did not require off-duty officers to carry their badge and, thus, the fact that an off-duty officer in March 2005 did not flash a badge does not mean that the officer was not taking police action. (PPFOF ¶ 5.)

Glover was aware that as an off-duty officer he was "obligated to take some form of action if witnessing a crime being occurred – that's occurring." (PPFOF ¶ 22; Glover Inquest Tr. 38, May 25, 2005.)

Milwaukee Police Department regulations require officers to take police action as they deem necessary to protect and serve the public, even when off-duty. (PPFOF ¶ 23.) The regulations in effect on March 6, 2005 (the "always on duty rule") provided:

> **2/015.00** Members of the police force shall, at all times within the boundaries of the City, preserve the public peace, prevent crime, detect and arrest violators of the law, and protect life and property.
>
> **2/025.00** The fact that they may be technically "off duty" shall not be held as relieving them from the responsibility of taking required police action in any matter coming to their attention at any time.

(PPFOF ¶ 24.)

There is evidence that Glover believed the driver of the van was armed with a dangerous weapon. (PPFOF ¶ 25.)

At this point, Glover fired a total of ten rounds of ammunition at or near the intersection of South 9th Street and West Ohio Avenue in the City of Milwaukee. (PPFOF ¶ 26.) Prado then exited the van. (PPFOF ¶ 27.) Glover again identified himself as a police officer and ordered the driver to get on the ground. (PPFOF ¶ 28.) Glover and the driver of the van made eye contact and Glover said to the driver, "Milwaukee Police Department. Get on the ground. Show me your hands." (PPFOF ¶ 29; Glover Inquest Tr. 21, May 23, 2005.) When the driver of the van did not comply, Glover yelled again, "Milwaukee Police. Get on the ground. Get on the ground." (PPFOF ¶ 30; Glover Inquest Tr. 22, May 23, 2005.)

Prado ran toward the alley. (PPFOF ¶ 31.) Glover continued to pursue the driver and there is evidence that it was Glover's intent to "safely and effectively take [the driver] into custody." (PPFOF ¶ 32; Glover Inquest Tr. 23-24, May 23, 2005.)

Glover fired a second time, this time a total of seven rounds of ammunition from his weapon at or near the entrance to the alley way along West Ohio Avenue between South 9th Street and South 9th Place. (PPFOF ¶ 33.)

Glover then fired his weapon a third time. (PPFOF ¶ 34.) Glover fired these final two shots in the alley between the garages of homes located at 3267 South 9th Street and 3264 South 9th Place. (PPFOF ¶ 35.)

In total, Glover fired 19 shots at Prado. (PPFOF ¶ 41.) Prado was shot a total of eight times. (PPFOF ¶ 42.) Three shots were to Prado's back, one shot was to his posterior left thigh, and one shot was to Prado's posterior right thigh. (PPFOF ¶ 43.) Prado was killed by shots that Glover fired. (PPFOF ¶ 44.) Prado's body was found in a parking lot, next to a garage, some distance north up the alley. (DPFOF ¶ 8.)

Glover called 911 and repeatedly identified himself to the operator as "an off-duty officer." (PPFOF ¶ 36.)

A number of individuals came forward with accounts of what they witnessed the night of the shooting.

Immediately after the shooting, Glover called to an individual standing nearby, Edward Gesinski-Rose. (PPFOF ¶ 37.) According to Gesinski-Rose, "[Glover] said he needed my help. [Glover] was an off-duty police officer and somebody had been shot." (*Id.*)

At the time of the shooting, another nearby individual, Dean Irwin, overheard Glover identify himself on his cell phone as an off-duty police officer. (PPFOF ¶ 38.)

Immediately after the shooting, Scott Diebel encountered Glover in the alley. (PPFOF ¶ 39.) And while in the alley, Glover told Diebel, "I'm an off-duty police officer." (*Id.*)

John Kasprzyk also saw Glover that evening immediately after the incident and Glover told Kasprzyk, "I'm an off-duty police officer. That man hit me but I think I got him." (PPFOF ¶ 40.)

In the early morning hours of March 6, 2005, Timothy Bohmann overheard gun shots and someone yelling in a demanding fashion, "Get down. Get down." (PPFOF ¶ 72.)

Glover was later found by other members of the police department in the vicinity of South 9th Street and West Ohio Avenue to have shot Wilbert Prado fatally, having discharged nineteen rounds from the pistol. (DPFOF ¶ 5.) Glover's private automobile was found near the intersection along with a van apparently driven by Wilbert Prado; the van was found crashed into two parked cars on the west side of the intersection. (DPFOF ¶ 6.)

Prado never fired any shots at Glover. (PPFOF ¶ 45.) Despite a thorough search of the scene, no weapon (other than Glover's own weapon) was discovered or ever recovered at or near the shooting scene by anyone investigating the shooting. (PPFOF ¶ 46.)

During the Milwaukee Police Department's investigation into the shooting, Glover stated that he repeatedly identified himself to Prado as a Milwaukee Police Officer. (PPFOF ¶ 47.) None of the Department's own reports of those interviews challenge or question Glover's statement that he was acting as a police officer. (PPFOF ¶ 48.)

On April 16, 2005, Glover filed a report entitled, "Health Insurance Claim," with Milwaukee Police Department Lieutenant of Police Richard P. Oliva. (PPFOF ¶ 49.)

On April 23, 2005, Glover filed a second report entitled, "On Duty Injury," with Lieutenant Oliva. (PPFOF ¶ 50.) That report summarizes the injuries Glover sustained during the incident. (PPFOF ¶ 51.) In that report, Glover states that the report is in reference to "an injury that I sustained while on duty . . ." (PPFOF ¶ 52.)

On April 23, 2005, Milwaukee Police Sergeant Terry Fahrenkrug signed and filed a "Report of Accident to Employee Under Worker's Compensation Act." (PPFOF ¶ 53.) Sergeant Fahrenkrug checked "Yes" on the form for the question "Is this employee eligible for injury pay?" (PPFOF ¶ 54.) Sergeant Fahrenkrug completed the "Injury Description" portion of the form stating, "Employee was attempting to conduct a field interview of a motorist." (PPFOF ¶ 55.)

Glover received Worker's Compensation Benefits for medical expenses from the City in the amount of $2,249.46 relating to injuries he sustained during the incident. (PPFOF ¶ 56.)

Glover remained an employee of the Milwaukee Police Department up to the date of his death on May 30, 2006. (PPFOF ¶ 57.)

Although City of Milwaukee Chief of Police Nannete Hegerty could have suspended Glover, she instead followed standard protocol and assigned Glover to station house duty for over a year following the incident. (PPFOF ¶ 58.) An assignment to station house duty does not imply any impropriety in conduct by the officer. (PPFOF ¶ 59.) An officer on station house duty receives all

pay and benefits. (PPFOF ¶ 60.) An officer on station house duty is not required to surrender his on-duty gun or a department-approved, off-duty weapon. (PPFOF ¶ 61.) An officer on station house duty is permitted to wear the uniform of the Milwaukee Police Department. (PPFOF ¶ 62.) An officer assigned to station house duty has a duty to take official police action when technically off-duty. (PPFOF ¶ 63.)

In a report authored by Lieutenant of Police Kurt R. Leibold on May 31, 2006, after Glover was criminally charged and committed suicide, Leibold adopted the following statements by Glover:

> a. "Officer Glover verbally identified himself as a police officer and instructed Mr. Prado to 'stop.'"
>
> b. "Officer Glover approached the van with his weapon drawn and continued to verbally identify himself as a police officer."
>
> c. " . . . . despite Officer Glover's repeated commands to stop."
>
> d. "While pursuing Mr. Prado, Officer Glover ordered Mr. Prado to 'get down' and 'drop his gun.'"

(PPFOF ¶ 64.)

On March 7, 2005, Chief of Police Nannette Hegerty wrote to the Milwaukee Fire and Police Commission regarding the incident. (PPFOF ¶ 65.) Throughout the letter, Chief Hegerty referred to Glover as "Officer Glover." (PPFOF ¶ 66.) Chief Hegerty adopted Glover's statements that he was acting as a police officer, noting twice that Glover "identified himself as a police officer" during the incident. (PPFOF ¶ 67.) Chief Hegerty also adopted Glover's statements that he had issued commands to Prado during the incident, twice noting the commands issued. (PPFOF ¶ 68.)

At the Inquest, Glover testified in full uniform as a Milwaukee Police Officer. (PPFOF ¶ 69.) At the inquest, Glover testified that he acted during the incident as a police officer. (PPFOF ¶ 70.)

The commands Glover gave to Prado were consistent with the types of orders a police officer would give someone they were attempting to apprehend. (PPFOF ¶ 71.)

Prior to this litigation, no one within the Milwaukee Police Department questioned Glover regarding his duty status or suggested that his actions during the incident were not within the scope of his position as a police officer. (PPFOF ¶ 73.)

It is not uncommon for an officer to take police action while off-duty and without the indicia of the office due to the off-duty status. (PPFOF ¶ 74.)

While an employee of the Milwaukee Police Department, former Deputy Chief of Police Brian O'Keefe took police action when he was off-duty, driving his personal car and wearing a suit and tie, when he happened upon someone breaking into a car. (PPFOF ¶ 75.) Deputy Chief O'Keefe jumped out of his car and chased after the suspect while in his suit and tie, but was unable to apprehend him. (PPFOF ¶ 76.)

While an employee of the Milwaukee Police Department, Officer Steven B. Svensson has taken official police action twice when off-duty. (PPFOF ¶ 77.)

While an employee of the Milwaukee Police Department, Detective David Salazar has taken police action while off-duty a "handful" of times. (PPFOF ¶ 78.)

While an employee of the Milwaukee Police Department, Sergeant Patti has taken police action when off-duty "numerous times." (PPFOF ¶ 79.)

While an employee of the Milwaukee Police Department, Detective Caballero has taken police action when off-duty. (PPFOF ¶ 80.) While off duty, Detective Caballero had to chase, tackle, and arrest a suspect who had stolen a car. (PPFOF ¶ 81.)

The "always on duty" rule requires an officer to respond to a traffic violation. (PPFOF ¶ 82.)

### III. SUMMARY JUDGMENT STANDARD

The purpose of summary judgment is to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,

475 U.S. 574, 587 (1986) (quoting Fed. R. Civ. P. 56(e) advisory committee's note to 1963 amendment). "Summary judgment is not appropriate 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

"[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). A party opposing a properly supported summary judgment motion "may not rely merely on allegations or denials in its own pleading; rather, its response must – by affidavits or as otherwise provided in this rule – set out specific facts showing a genuine issue for trial." Fed. R. Civ. P. 56(e)(2); *see also Outlaw v. Newkirk*, 259 F.3d 833, 837 (7th Cir. 2001). To state it differently, "[a] party will be successful in opposing summary judgment only when they present definite, competent evidence to rebut the motion." *EEOC v. Sears, Roebuck & Co.*, 233 F.3d 432, 437 (7th Cir. 2000) (quoting *Smith v. Severn*, 129 F.3d 419, 427 (7th Cir. 1997)).

To determine whether a genuine issue of material fact exists, the court must review the record, construing all facts in the light most favorable to the nonmoving party and drawing all reasonable inferences in that party's favor. *Heft v. Moore*, 351 F.3d 278, 282 (7th Cir. 2003) (citing *Anderson*, 477 U.S. at 255). "'In the light most favorable' simply means that summary judgment is not appropriate if the court must make 'a choice of inferences.'" *Draghi v. County of Cook*, 184 F.3d 689, 691 (7th Cir. 1999) (quoting *Smith*, 129 F.3d at 425). "The evidence must create more than 'some metaphysical doubt as to the material facts.'" *Albiero v. City of Kankakee*, 246 F.3d 927, 932 (7th Cir. 2001) (quoting *Johnson v. Univ. of Wis.-Eau Claire*, 70 F.3d 469, 477 (7th Cir. 1995)). "A mere

10

scintilla of evidence in support of the nonmovant's position is insufficient." *Id.* (citing *Anderson*, 477 U.S. at 252).

Thus, "the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

## IV. DISCUSSION

Throughout their respective briefs, the parties throw a flurry of punches and counterpunches at one another in the form of arguments. Such flurry tends to mask the City's core argument – that there is insufficient evidence from which a reasonable jury could find that "whatever Glover may have done to purport to act under color of state law influenced Prado's behavior in any way" (City's Br. at 5; City's Reply Br. at 2), and that therefore, Prado cannot succeed at trial.

In principal support of its core argument, the City cites to the Ninth Circuit case of *Anderson v. Warner*, 451 F.3d 1063 (9th Cir. 2006). In that case, an off-duty police lieutenant, Charles Warner, was rear-ended by Anderson while Warner was driving his vintage pick-up truck to a parade. After the accident, Warner got out of his truck, went back to Anderson's vehicle, opened the door, and began hitting Anderson. Warner, one of his friends who happened to be driving nearby, and Warner's wife, all kept bystanders at bay and kept them from interfering by telling people that Warner was a cop and that it was a "police matter." 451 F.3d at 1065-66.

The Ninth Circuit found that, at the time of the assault, Warner was acting under color of law. In reaching that conclusion, the court considered "three critical requirements":

> First, the defendant's action must have been performed while the officer is acting, purporting, or pretending to act in the performance of his or her official duties. Second, the officer's pretense of acting in the performance of his duties must have had the purpose and effect of influencing the behavior of others. Third, the challenged

> conduct must be related in some meaningful way either to the officer's government status or to the performance of his duties.

451 F.3d at 1068-69 (internal quotations and citations omitted). According to the City, "it is the second factor that is relevant to the issue at hand in this case." (City's Br. at 9.)

The City argues:

> [T]here is no evidence that whatever Glover may have done or, as the plaintiffs are sure to raise, whatever he may have said allowed Glover to misuse any power by fatally shooting Wilbert Prado. There is no evidence that Prado stopped his car before Glover started shooting because Glover announced himself as a police officer, or because Glover issued any commands in the name of the law, assuming he ever did so. There is no evidence, furthermore, that Prado then proceeded to stop his car by driving into parked vehicles because of any display of purported authority by Glover. Lastly, Prado was found shot in the alley some distance from his and Glover's vehicles; there is no evidence that any of the fatal shots, or, for that matter, that any of the non-fatal wounds were made possible by any display of purported authority. There is no evidence that Prado surrendered, stopped moving, or "gave up" because of anything that Glover did or said to purport that he was acting with the authority of state law.
>
> There is no evidence that Glover did anything but use "sheer force" to shoot and kill Prado and thus "his status as a police officer had no bearing on" what the plaintiffs are sure to describe as "his wicked behavior." He did not use any badge of authority to accomplish the use of fatal force upon Wilbert Prado. Applying the second part of the test employed by the ninth circuit, whatever Glover may have said was not done so "with the purpose and effect of influencing the behavior of" Prado. The plaintiffs simply cannot, therefore, establish that Glover acted under color of state law.

(City's Br. at 10-11.) Stated another way, and to reiterate, the City argues that there is no evidence that whatever Glover may have said or done, was said or done "with the purpose *and effect* of influencing the behavior of" Prado. (City's Br. at 11, emphasis added.) As a result, the City contends that a reasonable jury could not find that Glover was acting under color of law. (*Id.*)

To begin, *Anderson* was decided by the Ninth Circuit, not the Seventh Circuit. The City does not provide any Seventh Circuit decision that cites *Anderson* with approval.[2] Even more importantly, the Seventh Circuit has held that, for purposes of § 1983 liability,

> [a]ction is taken under color of state law when it involves a misuse of power possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law. As a result, acts by a state officer are not made under color of state law unless they are related in some way to the performance of the duties of the state office.

*Honaker v. Smith*, 256 F.3d 477, 485 (7th Cir. 2001) (internal quotations and citations omitted); *see also Burrell v. City of Mattoon*, 378 F.3d 642, 649 (7th Cir. 2004); *Pickrel v. City of Springfield*, 45 F.3d 1115, 1118 (7th Cir. 1995) ("Deciding whether a police officer acted under color of state law should turn largely on the nature of the specific acts the police officer performed . . . ."). Indeed, Seventh Circuit Pattern Civil Jury Instruction 7.03 states that "[w]hen I say that a person acts 'under color of law,' I mean that a person uses or misuses authority that he has because of his official position." In other words, in order to prove in the Seventh Circuit that a defendant acted "under color

---

[2] The *Anderson* opinion cites the opinion of the Ninth Circuit in *Van Ort v. Estate of Stanewich*, 92 F.3d 831, 838 (9th Cir. 1996), for its "purpose and effect test." In *Van Ort*, the court initially addressed the "under color of law" requirement by stating that "[o]nly if the [defendant's] actions were in some way related to the performance of his official duties, could his acts be fairly said to be under color of law." 92 F.3d at 838 (internal quotations and citations omitted). The court continued by stating that "[the defendant] also might have been acting under color of law if he had purported to or pretended to act under color of law, even if his goals were private and outside the scope of authority." *Id.* The court then proceeded to state that "[the defendant] could have been acting under color of state law if the [plaintiffs] had been injured during a meeting related to the provision of services pursuant to [the defendant's] employment, and if [the defendant] had used his government position to exert influence and physical control over [the plaintiffs], particularly if they were in awe of government officials." *Id.*

Based on the above, it appears that the court in *Anderson* collapsed the alternative standards as set forth in *Van Ort* into one all-encompassing standard. Notably, the *Anderson* opinion did not offer any insight as to why the court combined the three standards set forth in *Van Ort* into one – in effect heightened – standard. And at least one district court in the Ninth Circuit has continued to rely on the *Van Ort* decision. *See Abdi v. Lovell*, No. 08-CV-0321, 2009 U.S. Dist. LEXIS 30164, *12 (D. Ariz. April 9, 2009) (stating that "it is the defendant's objective behavior that determines whether an action occurred under color of state law, not the victim's subjective belief." (citing *Van Ort*, 92 F.3d at 835-37)).

of law" it does not appear to be necessary to show that it was precisely the defendant's "pretense of acting in the performance of his duties" that had *the effect* of influencing a plaintiff's behavior.

Thus, that the plaintiffs may not be able to show what precisely was running through Prado's mind at the time his car collided with the parked cars, at the time he ran into the alley, and at the time he was shot by Glover (i.e., what effect Glover's statements and actions had on Prado's behavior) is not dispositive. What matters is the evidence that the plaintiffs have of Glover's conduct. And, in my opinion, there is evidence that, if believed, would be sufficient to support a reasonable jury's finding that Glover used, or misused, his power as a City of Milwaukee police officer when he shot and killed Prado on March 6, 2005.

Furthermore, even if this court were to apply the *Anderson* three-factor test to the facts of this case, the City's motion would still be denied. Based on the facts set forth above, a jury could reasonably find that Glover intended to influence Prado's behavior and indeed did so (although perhaps not in the way he intended to influence it).

There is evidence that Glover repeatedly yelled at Prado to "get on the ground" and "show me your hands." He also repeatedly identified himself as a police officer.

Yet, Prado disregarded Glover's commands and fled down the alley. But his fleeing could very well have been precisely because Glover *did* identify himself as a police officer and Prado was afraid of being arrested for his driving behavior. Such a scenario, if accepted by the trier of fact, would satisfy the second factor of the *Anderson* three-factor test.

In sum, I am persuaded that the plaintiffs have submitted sufficient facts to support a finding that Officer Glover acted under color of law when he shot and killed Prado. Whether the trier of fact will find in favor of the plaintiffs remains to be seen. It is enough to say that there should be a trial on the issue.

As previously stated, the City also argues that the plaintiffs' *Monell* claim against the City should be dismissed. However, the City's argument is predicated exclusively on the court's dismissing the plaintiffs' §1983 claim against Glover. Specifically, the City argues that "[i]n the absence of a viable §1983 claim against Glover, the plaintiffs, of course, have no viable §1983 claim against the City of Milwaukee." (City's Br. at 13.) Because the court is denying the City's motion for partial summary judgment on the plaintiffs' §1983 claim against Glover, it necessarily follows that the City's motion for summary judgment on the plaintiffs' *Monell* claim against the City must also be denied.

Finally, the City argues that "[e]ven should this Court determine not to grant summary judgment dismissing all of the plaintiffs' §1983 claims, it should nevertheless grant summary judgment dismissing the plaintiffs' claims for punitive damages." (City' Br. at 14.)

Citing *Savarese v. Agriss*, 883 F.2d 1194 (3rd Cir. 1989), the City argues that punitive damages "are not generally awarded against a decedent." 883 F.2d at 1205, n. 15. According to the City, "[i]n the present case, the only defendant from whom plaintiffs can recover any punitive damages is Alfonso Glover. Tragically, he took his own life. The plaintiffs, therefore, cannot recover punitive damages in this action." (City's Br. at 14.)

In *Savarese*, the plaintiffs were two discharged employees of the Monroe County Transportation Authority. 883 F.2d at 1196. They alleged a deprivation of certain rights under the First and Fourteenth Amendments of the Constitution. *Id.* Specifically, they alleged that the defendants, one of whom was Dan Bogen, fired them on the basis of their political beliefs and in retaliation for a legal action filed by Savarese against various defendants. *Id.* A jury found in favor of the plaintiffs on the issue of liability, but found in favor of the defendants on the question of punitive damages and thereby denied the plaintiffs any punitive damages. *Id.* at 1198-99. On appeal

15

the court of appeals reversed the jury's verdict on the question of punitive damages and ordered a new trial because it found error in the trial court's instructions on punitive damages. *Id.* at 1210. In doing so, however, it stated in a footnote:

> Because this matter must be retried, we note that although defendant Bogen was deceased at the time of trial, the question of his liability as to punitive damages was submitted to the jury. Punitive damages, however, are not generally awarded against a decedent. *Novak v. Callahan*, *(In re GAC Corp.)*, 681 F.2d 1295, 1301 & n. 5 (11th Cir. 1982); *Barnes v. Smith*, 305 F.2d 226, 231 (10th Cir. 1962). *See* Restatement (Second) of Torts § 908 comment a (1979).

883 F.2d at 1205, n. 15.

First of all, the court in *Savarese* offered no analysis in support of its conclusory statement. Instead, it rested its statement on *Novak* and *Barnes*. But *Novak* was a bankruptcy case that did not involve a claim under §1983. Similarly, *Barnes* was a wrongful death and personal injury action; it did not involve an alleged violation of §1983. Finally, the section of the Restatement of Torts cited by the *Savarese* court merely sets forth the general rule on punitive damages in tort cases; it does not specifically address claims under § 1983.

Rather than relying on *Savarese*, I am to be guided by Seventh Circuit law on the question of the right to recover punitive damages from a deceased defendant's estate under a § 1983 claim. And while there is no Seventh Circuit decision directly on point, the Seventh Circuit's decision in *Graham v. Sauk Prairie Police Commission*, 915 F.2d 1085 (7th Cir. 1990), certainly suggests that the death of a defendant in a § 1983 action should not alone serve to bar the recovery of punitive damages from that defendant.

In *Graham*, the widow of an arrestee who was shot and killed by a police officer brought a § 1983 civil rights action the estate of the deceased officer and certain villages. *Id.* at 1088. The Seventh Circuit rejected an argument that loss-of-life damages should not be awarded against the deceased police officer's estate. *Id.* at 1105. In doing so, the court stated:

> Section 1983 damages are considered to be appropriate as long as those damages generally effectuate the policies underlying § 1983. The fundamental policies underlying § 1983 are compensation for, and deterrence of, unconstitutional acts committed under state law.
>
> . . . .
>
> The fact that Mueller [the deceased officer] can no longer be deterred is quite irrelevant. The deterrence objective of § 1983 damages is directed at a broader category of persons than the individual perpetrator alone. In *Bell [v. City of Milwaukee*, 746 F.2d 1205 (7th Cir. 1984), *overruled on other grounds, Russ v. Watts*, 414 F.3d 783 (7th Cir. 2005)], this court started that loss of life damages are intended to have a deterrent effect on "potentially unconstitutional actors." No specific deterrence could have been accomplished in *Bell* because in that case, the offending officer had resigned from the force. Like Mueller, the officer in *Bell* was no longer in a position to repeat his unconstitutional acts.

*Id.* at 1105 (citations omitted).

So too here. The fact that Glover *himself* is no longer in a position to be deterred from any future unconstitutional acts in his capacity as a police officer is not alone sufficient to prevent the plaintiffs from attempting to recover punitive damages from his estate for his alleged unconstitutional acts. This is because "[t]he deterrence objective of § 1983 damages is directed at a broader category of persons than the individual perpetrator alone." *Id.* The deterrence objective also includes "potentially unconstitutional actors." *Id.* (internal citations omitted); s*ee Estate of Arana v. City of Chicago*, 1992 WL 162965 (N.D. Ill. July 2, 1992) (stating that the estate of a deceased plaintiff was allowed to proceed on punitive damages § 1983 claim against estate of defendant). Thus, to the extent that the City's motion seeks to have the plaintiffs barred from attempting to recover punitive damages from Glover's estate, such motion will be denied.

In conclusion, and for all of the foregoing reasons, the City's motion for partial summary judgment will be denied.

**NOW THEREFORE IT IS ORDERED** that defendant City of Milwaukee's motion for partial summary judgment be and hereby is **DENIED**;

**IT IS FURTHER ORDERED** that a status/scheduling conference will be conducted in this action on January 26, 2010 at 9:30 a.m. to discuss with the parties the further steps needed to bring this action to judgment.

**SO ORDERED** this 23rd day of December 2009 at Milwaukee, Wisconsin.

                                              **BY THE COURT:**

                                              s/ William E. Callahan, Jr.
                                              WILLIAM E. CALLAHAN, JR.
                                              United States Magistrate Judge